[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
{¶ 1} This case involves an appeal from a final judgment entered by the trial court declaring that all of the prerequisites for effective termination of a certain lease entered between defendant-appellant, The Board of the State Teachers Retirement System of Ohio ("STRS") and plaintiff-appellee, Glimcher Properties Limited Partnership ("Glimcher"), had been proven by a greater weight of the evidence during the course of a lengthy trial to the court.
 {¶ 2} A review of the record in this matter supports the detailed findings of fact issued by the trial court, and we have attached them as an appendix to this opinion. For these reasons and those that follow, we affirm the trial court's judgment in favor of appellee Glimcher.
 {¶ 3} STRS has assigned five assignments of error which follow:
 {¶ 4} "1. The Trial Court erroneously construed Section 22 of the subject lease (the "Lease") as granting Plaintiff-Appellee Glimcher Properties Limited Partnership ("Glimcher") a contractual right to terminate the Lease when, as a matter of law, Section 22 of the Lease merely establishes a condition precedent to Glimcher's pursuit of a common law claim of constructive eviction to obtain termination of the Lease.
 {¶ 5} "2. Even if Section 22 of the Lease had granted a contractual right to terminate the Lease, the Trial Court erroneously failed to determine whether or not the alleged defaults were material and, as a matter of law, the alleged defaults unequivocally were not material.
 {¶ 6} "3. The Trial Court erroneously admitted and relied upon evidence of events occurring after January 18, 2002 in determining that the Lease was terminated as of January 18, 2002.
 {¶ 7} "4. The Trial Court erroneously determined that Glimcher issued a legally sufficient notice of default under Section 22 of the Lease.
 {¶ 8} "5. The Trial Court's decision is manifestly against the great weight of the evidence."
 {¶ 9} We will treat these assignments together except as to assignment of error number four.
 {¶ 10} The lease premises, during the course of Glimcher's occupancy, constituted parts of the second and third floors of the building known as the Galleria. The lease ran from March 24, 1994 through March 31, 2004, calling for an annual rental of $550,935, subsequently modified by an amendment which increased the total annual rent to $576,987. The lease contained, in paragraphs 22 and 23, the following terms addressing default, cure, waiver, and termination:
 {¶ 11} "22. Landlord's Default. If Landlord shall default in the performance or observance of any agreement or condition on its part to be performed or observed under this Lease and Landlord shall fail to cure said default within thirty (30) days after receipt of written notice thereof from Tenant or if the same cannot with due diligence be cured within such thirty (30) day period then Landlord shall fail to promptly commence to cure the same within thirty (30) day period and diligently pursue such cure to completion, Tenant, at any time thereafter, Tenant may pursue of any of Tenant's rights or remedies available to Tenant at law or in equity, including, but not limited to, termination of this Lease. If Tenant makes any expenditures or incurs any reasonable attorneys' fees and disbursements, in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred and costs, plus interest at the Default Rate from the date of such expenditure to the date of setoff, shall be paid to Tenant by Landlord on demand. If Landlord fails to pay any sum required to be paid hereunder within thirty (30) days after demand is made therefor by Tenant, or if Landlord is contesting the same then within thirty (30) days after the issuance of a final arbitration decision or a final court order requiring such payment, Tenant shall be entitled to set off such expenditure against the next due installment(s) of Base Rent or terminate this Lease.
 {¶ 12} "23. Waiver of Default or Remedy. (a) No waiver of any covenant or condition or of the breach of any covenant or condition of this Lease shall be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the nonobservance on any other occasion of the same or of any other covenant or condition hereof, nor shall the acceptance of rent by Landlord at any time when Tenant is in default under any covenant or condition hereof be construed as a waiver of such default or of Landlord's right to terminate this Lease on account of such default, nor shall any waiver or indulgence granted by Landlord to Tenant be taken as an estoppel against Landlord, it being expressly understood that if at any time Tenant shall be in default in any of its covenants or conditions hereunder an acceptance by Landlord of rental during the continuance of such default or the failure on the part of Landlord promptly to avail itself of such rights or remedies as Landlord may have, shall not be construed as a waiver of such default, but Landlord may at any time thereafter, if such default continues, terminate this Lease or assert any other rights or remedies available to it on account of such default in the manner hereinbefore provided.
 {¶ 13} "(b) No waiver of any covenant or conditions by Tenant or of the breach by Landlord of any covenant or condition of this Lease shall be taken to constitute a waiver of any subsequent breach by Landlord of such covenant or condition nor to justify or authorize the nonobservance on any other occasion of the same or of any other covenant or conditions hereof, nor shall any waiver or indulgence granted by Tenant to Landlord be taken as an estoppel against Tenant, it being expressly understood that if at any time Landlord shall be in default in any of its covenants or conditions hereunder the failure on the part of Tenant promptly to avail itself of such rights or remedies as Tenant may have, shall not be construed as a waiver of such default, but Tenant may at any time thereafter, if such default continues, assert any other rights or remedies available to it on account of such default in the manner hereinbefore provided."
 {¶ 14} The trial court's findings of fact, which are supported by the record, among other things reflect the following problems on the lease premises: (a) substantial amounts of insect infestation and a continuing problem with rodents on the lease premises throughout Glimcher's tenure; (b) a continuing problem with the elevator serving the lease premises, which involved a potentially lethal situation and caused great fear to the secretarial staff; (c) offensive odors which permeated the lease premises; and (d) a continuing problem regarding water leakage throughout the building, with water running down the walls, deterioration of the plaster, and cracks in the walls, generally interfering with the functions of the office and causing damage to the furnishings owned by Glimcher on the lease premises.
 {¶ 15} Appellant argues that the problems noted above were immaterial breaches. We disagree. The aforementioned problems were surely material breaches by the lessor and, in this court's view, can hardly be viewed as immaterial particularly when taken as a whole. While efforts to cure some of the problems noted above were made, they were not made in a timely fashion after notice and the efforts were clearly not effective in solving any of the problems outlined above.
 {¶ 16} Appellants argue that Paragraph 22 of the lease does not grant Glimcher the contractual right to terminate the lease where STRS has failed to cure or make efforts to cure the defaults in a timely fashion after receiving notice thereof. We find the unambiguous language of Paragraph 22 of the lease provides the mechanism for termination following default by the lessor. A letter of default was timely sent and a specific reference to Paragraph 22 of the lease would have been unnecessary verbiage. The letter with respect to the various defaults was sent on November 1, 2001, received on November 6, 2001, and contained far more than necessary for the lessor to have actual knowledge of the sundry shortcomings at the premises in violation of the lease terms outlined above.
 {¶ 17} Finally, while some effort by STRS to cure some of the lease problems was made, although not in a timely fashion, STRS completely failed to diligently pursue the water problems, made no efforts to cure the insect and rodent problems within the 30 day window, and nothing was done to solve the odor problem. Suffice it to say the elevator malfunction was not even addressed until after the termination letter was sent, i.e. January 18, 2002. We think it axiomatic that STRS had the obligation to cure the problems in a timely fashion and there were ample grounds to effectively terminate the lease in accordance with its terms, specifically those set forth in Paragraph 22.
 {¶ 18} Appellants argue that Paragraph 22 is inapplicable to the situation at hand. We find Paragraph 22 to be perfectly clear and we find this meaning quite apparent and therefore feel that the trial court properly applied same. See Albert v. Shiells (Dec. 19, 2002), Franklin App. No. 02AP-354, 2002-Ohio-7021, at ¶ 20. In the case before us, Paragraph 22, captioned "Landlord's Default," gave Glimcher the right to terminate the lease following provision of written notice of default and the failure to timely cure the default. Glimcher was vested with "all the rights or remedies available to a tenant at law or in equity, including but not limited to termination of this Lease." That is precisely what has happened here.
 {¶ 19} Appellant has also suggested that some form of waiver applies to negate the default by appellee. This argument is certainly inapplicable here since Glimcher held over and availed itself of its right at law by filing the declaratory judgment action which led to the trial court's entering judgment against STRS. This case does not involve "constructive eviction" as such, although in candor, it could well be argued that we had a constructive eviction here. None of the cases cited by appellant involved a specific clause providing for termination if certain conditions prevail. As noted by appellee, the principal case provided by STRS is consistent with the proposition that a termination clause in the lease is binding without the need for an actual or constructive eviction. See Liberal Savings Loan Co. v. Frankel Realty Co. (1940), 137 Ohio St. 489.
 {¶ 20} The trial court found correctly that the notice sent STRS did not need to refer to some specific section of the lease if the breaching party is sufficiently advised of the specific nature of the defaults. The November 1, 2001 notice of the continuing problems and the threat of legal action detailed the problems on the premises. Indeed, the letter reminded STRS that it had 30 days to correct the items of default.
 {¶ 21} STRS argues that the various problems noted above on the premises should be resolved by Glimcher, who could fix same and then bring an action for damages against STRS. We think it quite apparent that Glimcher had no authority to structurally alter the outside of the building with respect to the water leaks, the problems with the elevator, or the odor problem. It is simply not a tenable proposition to suggest that a tenant is required to cure major structural defaults by the landlord, many of which exceed the scope of the premises occupied by the tenant, before seeking to terminate the lease.
 {¶ 22} Based upon the foregoing, appellant's first, second, third, and fifth assignments of error are overruled.
 {¶ 23} We now move on to appellant's fourth assignment of error, i.e., the admission of evidence of conditions after the date of lease termination set by the trial court. In this context, we would note that the trial court's evidentiary rulings will only be reversed upon the showing of an abuse of discretion. State v. Maurer (1984),15 Ohio St.3d 239, 265. We think it apparent that evidence of what STRS did after January 18, 2002, was probative of whether STRS satisfied its obligation to cure. Again, we would note that the elevator problem was not even addressed until after the termination letter. We believe this fact is indeed relevant and probative with respect to this controversy. Further, STRS has specified no prejudice flowing from the admission this evidence at trial to the court. Thus, STRS' fourth assignment of error has no merit.
 {¶ 24} In conclusion, we agree with the trial court's conclusions that the terms of the lease unambiguously provided a mechanism by which Glimcher could terminate the lease in event of default. A letter was indeed sent, the noticed defaults were not cured within thirty (30) days, nor did STRS promptly begin to cure and diligently pursue the cure to completion. The letter of default surely provided the lessor with notice of the various problems noted above. Finally, while the letter of default did not specifically point to Paragraph 22 of the lease, we agree with the findings in Gallagher v. Borden, Inc. (1992), 84 Ohio App.3d 185,189, that reference to a specific paragraph of a lease is not required to put a lessor on notice of what is in default as long as the notice contains information necessary for the lessor to have actual knowledge of the various shortcomings at issue.
 {¶ 25} Thus, for all these reasons, the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE, P.J., KLATT WRIGHT, JJ., concur.
Justice J. Craig Wright, retired of the Ohio Supreme Court, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 FINDINGS OF FACT
{¶ 26} Plaintiffs, Glimcher Partners Limited Partnership, is a limited partnership organized under Delaware law with its principal place of business and corporate offices at 20 So. Third Street, Columbus, Ohio 43215. Glimcher is in the business of real estate development, including the management and ownership of over 100 strip and regional malls throughout the United States.
{¶ 27} Defendant, Defendant, [sic] the Board of the State Teachers Retirement System of Ohio ("STRS") owns real estate throughout the country including what is commonly known as the "National City Plaza Building," located on the southeast corner of the intersection of West Broad Street and South Third Street in Columbus, Ohio ("the Property"). STRS subcontracted its management obligations for the property to CB Richard Ellis and its predecessor in interest, Matthews Click Baumann (collectively, "CB Richard Ellis").
{¶ 28} In 1993, Glimcher was seeking new high quality space for its corporate headquarters. High quality commercial office space is commonly known in the industry as "A space." "A space" is a building which is in the highest quality condition and contains first class office space. The Property is considered to be "A space" along with a few other prominent office buildings in downtown Columbus.
{¶ 29} On September 10, 1993, STRS entered into a ten (10) year lease ("the Lease") with Glimcher's predecessor, The Glimcher Company whereby STRS leased to Glimcher portions of the second and third floor of the Galleria portion of the Property ("the Glimcher Space"). The term of the Lease actually commenced on March 21, 1994, and has an expiration date of March 31, 2004.
{¶ 30} A large Glimcher sign is on the outside of the Galleria facing Capitol Square. A second prominent Glimcher sign is in the reception area for the executive offices on the third floor.
{¶ 31} The lease provides the following means by which Glimcher can terminate the Lease in the event of a STRS default:
{¶ 32} If Landlord shall default in the performance or observance of any agreement or condition on its part to be performed or observed under this "Lease and Landlord shall fail to cure said default within thirty (30) days after receipt of written notice thereof from Tenant or if the same cannot be with due diligence be cured with such thirty (30) day period then Landlord shall fail to promptly commence to cure the same within such thirty (30) day period and diligently pursue such cure to completion. Tenant, at any time thereafter, Tenant may pursue of any of Tenant's rights or remedies available to Tenant at law or in equity, including, but not limited to termination of this Lease. [Emphasis Added]
{¶ 33} If a default has taken place under the Lease, Glimcher is entitled to recover certain costs as a result of the default:
{¶ 34} If tenant makes any expenditures or incurs any obligations for the payment of money in connection with Landlord's default, including but not limited to, reasonable attorney's fees and disbursements, in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred and costs, plus interest at the Default Rate from the date of such expenditure to the date of setoff, shall be paid to Tenant by Landlord on demand if Landlord fails to pay any sum required to be paid hereunder within thirty (30) days after demand is made therefor by Tenant, or if Landlord is contesting the same then within thirty (30) days after the issuance of a . . . final court order requiring such payment, Tenant shall be entitled to set off such expenditure against the next due installment(s) of Base Rent or terminate the Lease.
{¶ 35} The third floor of the Glimcher Space contains the executive offices, which include the offices of the Chairman of the Board, Herbert Glimcher and the President, Michael Glimcher. The Glimcher Space also contains an executive dining room used to entertain business guests of Glimcher and the offices of the Chief Financial Officer and the General Counsel. The third floor of the Glimcher space has a glass skylight ("skylight") around the perimeter of the office space.
{¶ 36} Underneath the Galleria is a parking garage which is used by 24 Glimcher employees as well as guests and clients of Glimcher. There is an elevator which goes from the bottom level of the garage (P3) to the reception area of the Glimcher space located on the third floor. There is no other elevator which goes directly from the garage to the third floor. Guests of Glimcher can only enter the office space through the third floor lobby which can only be accessed by the elevator. This provides Glimcher with the ability to secure and restrict access to its office space.
{¶ 37} Commencing in the beginning of the Lease, Glimcher experienced problems with the Glimcher space, most notably water leakage and damage. However, beginning in 1999, Glimcher employees not only had complaints related to water leakage and water damage, but also complaints regarding elevator malfunction and rodents, insects, and odors. Three or four complaints per week were forwarded to Kim Witter of Glimcher who presented them to building security or building management.
{¶ 38} On November 1, 2001, Glimcher sent a letter advising STRS that it was in default under the Lease and that it needed to cure the default.
{¶ 39} Beginning when they moved into the space, Glimcher observed that the skylight would leak into the offices on the third floor. This leakage caused damage to the soffits, walls, ceilings and columns of the Glimcher space. When these leaks occur, water can be seen running down the walls and columns. The water deteriorates the plaster and creates brown water stains. The deteriorated plaster then cracks or falls on the furniture.
{¶ 40} Over the last eight years, Glimcher reported these leaks to STRS through its agent CB Richard Ellis. Glimcher was continuously assured that the leaks would be resolved.
{¶ 41} In June, 2000, CB Richard Ellis represented to Glimcher that the skylight would be caulked and that the paint and plaster would be repaired. The repairs were not made promptly and the damage caused by leaks continued to the walls, columns and soffit in 13 offices in the Glimcher space.
{¶ 42} Even though Glimcher continued to make numerous complaints during the years 2000 and 2001 to the various building managers (Gary Petsche, Julie Gibson and Gail Simone), the leaks still continued and the damaged walls, columns, and soffit remained present.
{¶ 43} The water damage was so noticeable in Mr. Herbert Glimcher's office, that prospective business clients would observe water stains, falling paint and plaster while discussing prospective projects with Glimcher. Mr. Herbert Glimcher had to leave his office over twenty-five (25) times because of the leaks.
{¶ 44} The Glimcher office remained in such a condition throughout the remainder of the year 2000, through all of 2001 and up to January 18, 2002. Mr. Mark Andrews (a maintenance man in the building) confirmed that there was damaged plaster, bubbled paint, brown water lines in these offices as of the date of termination and, in one office, a bowing of the soffit.
{¶ 45} Near the end of the year 2000, Glimcher began to experience with increasing frequency a number of problems with the elevator going from the parking garage to the Glimcher space. These problems included misleveling (where the elevator stops either higher or lower than the floor landing), dropping (where the elevator accelerates for a period of time before finally decelerating and coming to a stop), entrapments and bobbing (where the elevator goes down upon a person's entry into the elevator and then comes back up).
{¶ 46} Glimcher reported these incidents to building security as well as to CB Richard Ellis. The response was that the elevator would be fixed. CB Richard Ellis would report the incident to Schindler Elevator (the elevator service provider for the building) and a mechanic would be sent to examine the elevator. On several occasions, two incidents were not reported to the Schindler hot line and not noted in the call back log. During one incident involving Mr. Joshua Morrow, the elevator misleveled by a foot which caused Mr. Morrow to fall and injure his wrist. The mechanic from Schindler testified that if the building did not report an incident it would not be investigated. On January 23, 2002, Mr. George Schmidt, general counsel for Glimcher, experienced a sudden dropping in the elevator which resulted in a crashing into the concrete foundation of the basement. This incident while reported to building management was not reported to Schindler.
{¶ 47} Throughout 2001, Glimcher personnel continued to experience misleveling, entrapments, and dropping incidents. Corporate and governmental guests of Glimcher were also experiencing entrapments with the elevator. These incidents were reported to building security or CB Richard Ellis. STRS' response regarding misleveling was to install a tank heater which cost $985.
{¶ 48} In response to these problems, Schindler, as early as January 2001, recommended to CB Richard Ellis that the antiquated pile relay system which controls the elevators acceleration, deceleration, starting, stopping and leveling be replaced with a solid-state control system to significantly enhance dependability and reliability. The pile relays require that very small silver contact points touch in order for the elevator to properly function. Contact failures with pile relays occur in elevators over 20 years old and cause the problems with the elevator that Glimcher was experiencing. In the late summer of 2001, Schindler explained to Todd Honeycutt, the STRS person responsible for the building, that misleveling and entrapments were just going to happen with an elevator of this age. STRS decided not to spend the money to install solid-state controls during 2001.
{¶ 49} As a result of the continued elevator malfunctions, a number of Glimcher employees use the stairs instead of the elevator to avoid the chance of being trapped in the elevator or being subject to a sudden drop or misleveling. If the elevator was not operating, Glimcher must leave the stairwell to its third floor open so that visitors can reach the Glimcher space. This leaves the Glimcher space unsecured and subject to visits by transients. Business clients have gotten lost trying to navigate the stairs from the parking garage to the Glimcher space.
{¶ 50} During a meeting of October 2, 2001, Mr. Herbert Glimcher met with Mr. Honeycutt and discussed among other things the condition of the elevator. Mr. Honeycutt agreed and discussed among other things the condition of the elevator. Mr. Honeycutt agreed with Mr. Glimcher that the elevator should be fixed to avoid misleveling and entrapment. However, STRS took no steps after that meeting and up to November 1, 2001 to fix the elevator.
{¶ 51} Prior to the end of 2001, the elevator again malfunctioned on a trip from the third floor to P3, causing it to decelerate improperly prior to hitting the basement floor.
{¶ 52} Glimcher personnel testified that over the past four years they have seen live and dead insects in the Glimcher space, including cockroaches and beetles. These insects have been seen in offices, cubicles, the executive kitchen (where food is prepared), in bathrooms, the C.E.O. and President's offices and private bathroom, in the lobby and conference room.
{¶ 53} In addition to insects, rodents have been present in the Glimcher space over the past few years. The rodents have reappeared in offices, the conference room, and in food.
{¶ 54} Glimcher employees have reported approximately 10 complaints of mice per year and numerous more complaints regarding cockroaches.
{¶ 55} Testimony from Mr. Andrews that within a two-week period he trapped 6 to 8 mice confirms the existence of mice within the space.
{¶ 56} The insects and rodents have been reported to building management, and on occasion, live and dead insects have been delivered to building management to demonstrate the extent of the problem.
{¶ 57} STRS' response is that the insect and rodent problem will be "taken care of." Insects and rodents continue to be present in the Glimcher space.
{¶ 58} Since January 2001, pest control services have been provided by Bischoff Pest Control under a letter agreement dated January 30, 2001. That agreement provides that certain areas of the building would be serviced monthly for the cost of $120 per month. The Glimcher space is not included in the agreement as an area to be serviced on a monthly basis. While Mr. Bischoff testified that monthly spraying of the Glimcher space takes place the Court views this testimony with skepticism since such spraying is not part of the contract, and Mr. Bischoff is not compensated for this alleged additional work, and Glimcher has never been notified that its offices will be sprayed at a certain date or time.
{¶ 59} For the past few years Glimcher has experienced two different odors in its space which have not been permanently resolved.
{¶ 60} The first odor is from the restaurant on the first floor of the building. Since the restaurant is located on the west side of the Galleria and Mr. Herbert Glimcher's office is on the west side of the Glimcher space he smells the odor on a regular basis. This smell distracts Mr. Glimcher from his work and has been reported to building management.
{¶ 61} The second odor is the smell of diesel or gas fumes, which has been present for the past eight years in the north and south portions of the Glimcher space. These portions of the space are located above the alleys adjacent to the building. The fumes are sucked into the Glimcher space through the fresh air intake located right above the docks where trucks park while making deliveries.
{¶ 62} Although complaints have been made for years regarding this odor, STRS' response is to ask the truck drivers to turn off their engine. This solution has not stopped the diesel odor from returning. This smell has caused some employees to become sick and has caused others to be unable to continue their work. Building management never investigated the cost to move the fresh air intakes.
{¶ 63} Although Glimcher complained for years regarding the odors, water leakage, water damage, bugs, rodents and more recently regarding the safety of the elevator, STRS failed to resolve the problems. The problems have distracted Glimcher employees from their work and adversely impacted on Glimcher's image.
{¶ 64} On November 1, 2001, Glimcher sent to STRS a letter (the "letter of default") putting them on notice of their default of the Lease. The third to last paragraph of that letter provides that:
{¶ 65} In addition to the items outlined in the letter and memos referenced hereinabove, Glimcher's executive office employees have experienced frequent interruptions in these offices with mice running through the Premises, large roaches have also been present with the Premises, and odors have invaded the Premises from the restaurant located on the first floor of the Galleria.
{¶ 66} Elevator access to and egress from the Premises has been interrupted on a number of occasions including situations where employees have been trapped in the elevators as they attempted to exit our Premises in the Galleria as well as in the Capitol Parking Garage resulting in unsafe working conditions for our employees.
{¶ 67} Earlier in that letter, Glimcher referred to continual water leaks and the resulting damage in the Glimcher space.
{¶ 68} STRS' attorney, Mr. Thomas Counts, acknowledged receipt of the notice of default on November 6, 2001. Mr. Counts quoted the language of the Lease that STRS has 30 days from written notice of default to correct the items of default and advised Glimcher that STRS had until December 1, 2001 to correct any deficiencies.
{¶ 69} While STRS in that 30-day period began work to repair the water leaks, no affirmative action was taken to resolve the elevator, insect or rodent, or odor problems.
{¶ 70} On January 18, 2002, Glimcher, through its counsel, sent a letter to STRS pursuant to Paragraph 22 of the Lease terminating the Lease (the "termination letter"). filed this lawsuit seeking a declaration that the Lease was effectively terminated.
{¶ 71} On January 18, 2002, Glimcher filed this lawsuit seeking a declaration that the Lease was effectively terminated.
{¶ 72} The outside work to repair the leaks was completed on November 21, 2001. By mid-January, STRS knew that the outside work was successful in repairing the leak. However, STRS did not arrange for Mr. Andrews to perform any interior work until March 6-9, 2002. Significant additional interior work was still needed when identified by Kim Witter in April 2002. Additional work had to be done in July, 2002, and damage in Mr. Herbert Glimcher's office still required repair as of August 19, 2002. STRS hired a professional painter to complete the water damage in the bank portion of the skylight, but did not use a professional painter for the Glimcher space.
{¶ 73} After the letter of default was sent, STRS failed to do anything to correct the continuous malfunctions in the elevator.
{¶ 74} Finally, after over a year of Schindler recommending replacement of the controls and after the letter of termination was sent on January 18, 2002, CB Richard Ellis contacted Robert Kirkey, an outside consultant, to review the elevator. After an hour reviewing the elevator, Mr. Kirkey on January 31, 2002 sent a letter recommending that the solid-state controls be replaced. Mr. Kirkey testified that this is a recommendation that he would have made if he had been called out six months earlier.
{¶ 75} Prior to Mr. Kirkey's letter arriving, Schindler submitted a proposal, putting in writing its year-long recommendation that the solid-state controls be installed. This proposal was immediately accepted by STRS.
{¶ 76} The solid-state controls were installed at the end of March, 2002 and since that time that elevator has run with little complaints.
{¶ 77} After the notice of default letter was sent, there is no evidence that STRS took any action to resolve the continued rodent and insect complaints, such as amending the agreement with Bischoff to include monthly spraying of the Glimcher space.
{¶ 78} After the Schmidt letter STRS has taken no steps to permanently resolve the diesel fuel odor or the restaurant odor.